R. McALISTER

v.

Carl ROBINSON et al.

Frank PASSALACQUA

v.

Carl ROBINSON et al.

Anthony T. KOZLINSKI

v.

Carl ROBINSON et al.

Salvatore RAFFONE

v.

Carl ROBINSON et al.

Civ. Nos. H–77–628, H–77–629, H–77–661 and H–77–672.

United States District Court, D. Connecticut.

March 30, 1978.

Jon Blue, Legal Assistance to Prisoners, Hartford, Conn. (Court-appointed), for petitioners.

Stephen J. O'Neill, Asst. Atty. Gen., Carl Ajello, Atty. Gen., Hartford, Conn., for defendants.

FINDINGS OF FACT AND RECOMMENDED DECISION

F. OWEN EAGAN, United States Magistrate.

This is an action for declaratory, injunctive and monetary relief brought by four

prisoners incarcerated at the Connecticut Correctional Institution, Somers (hereinafter, referred to as C.C.I.S.), located in Somers, Connecticut, against the Warden of C.C.I.S. and the Connecticut Commissioner of Corrections. The plaintiffs allege their transfer from the general population to segregated confinement, and continued maintenance therein, without notice and/or hearing either before or after the transfer, violated the rights guaranteed to them by the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

### JURISDICTION

Jurisdiction for declaratory relief is claimed to be based upon 28 U.S.C. §§ 2201–02. Section 2201 creates a remedy of declaratory relief "in a case of actual controversy." The present litigation involves an actual controversy, *viz.*, the plaintiffs' alleged deprivations of constitutional rights arising out of their segregated confinement. Section 2201 also provides that declaratory relief may be granted "whether or not further relief is or could be sought", and section 2202 provides that "further necessary or proper relief based on a declaratory judgment or decree may be granted."

■ The plaintiffs base their claim of action for injunctive and monetary relief upon 42 U.S.C. § 1983 and its jurisdictional counterpart 28 U.S.C. § 1343(3) and (4). While federal courts have allowed state prison authorities a great deal of latitude conducting the day-to-day affairs of prison administration, *Numer v. Miller, et al.,* 165 F.2d 986 (9th Cir. 1948); *United States ex rel. Knight v. Ragen, et al.,* 337 F.2d 425 (7th Cir. 1964), *cert. den.,* 380 U.S. 985, 85 S.Ct. 1355, 14 L.Ed.2d 277 (1965), it is "now settled beyond question . . . that claims of the kind presented here [allegedly unconstitutional segregated confinement] are within the jurisdiction of the federal courts under the Civil Rights Act (42 U.S.C.

§ 1983; 28 U.S.C. § 1343)" [citations omitted]. *Carter, et al. v. McGinnis, et al.,* 320 F.Supp. 1092 (W.D.N.Y.1970).[1]

These two jurisdictional bases involve district judicial remedies. In light of this consideration, the court will first declare the rights of the parties and then decide upon the appropriate injunctive and/or monetary relief.

### BACKGROUND OF LITIGATION

This action was initiated *pro se* on December 27, 1977, by a letter mailed to Jon O. Newman, United States District Court Judge for the District of Connecticut, and signed by all four plaintiffs. In that letter, the plaintiffs requested Judge Newman to issue an Order to Show Cause to the Connecticut State Police, C Troop, as to why the plaintiffs should be continued in segregated confinement. The case was subsequently assigned to T. Emmet Clarie, Chief Judge, United States District Court for the District of Connecticut.

On December 30, 1977, F. Owen Eagan, United States Magistrate for the District of Connecticut, issued four Orders to Show Cause, one for each plaintiff, to be served upon Carl Robinson, Warden of C.C.I.S. (hereinafter referred to as the Warden). The orders compelled the Warden to show why the plaintiffs should not be released back into the general population of the prison. The orders also allowed the plaintiffs to proceed *in forma pauperis,* and that their petitions be filed by the clerk without payment of the statutory filing fee, pursuant to 28 U.S.C. § 1915(a).

Counsel was appointed on December 29, 1977, and filed a formal complaint on January 6, 1978, in which the four cases were consolidated. The Warden was named as a defendant, along with John R. Manson, the Connecticut Commissioner of Corrections (hereinafter referred to as the Commissioner), both in their individual and official capacities. With the complaint, the plain-

---

1. See also, *Davis v. Lindsay,* 321 F.Supp. 1134 (S.D.N.Y.1970); *United States ex rel. Walker v. Mancusi,* 338 F.Supp. 311 (W.D.N.Y.1971), *aff'd,* 467 F.2d 51 (2d Cir. 1972); *United States*

*ex rel. Robinson v. Mancusi,* 340 F.Supp. 662 (W.D.N.Y.1972); *Powell v. Ward,* 392 F.Supp. 628 (S.D.N.Y.1975), *modified on other grounds,* 542 F.2d 101 (2d Cir. 1976).

tiffs filed a Consolidated Motion for Preliminary Injunction.

In an order dated January 17, 1978, Judge Clarie referred the four cases to Magistrate Eagan under 28 U.S.C. § 636(b)(2) and Rule 1 of the Rules of United States Magistrates. Pursuant to that order, hearings were held at the courtroom within the C.C.I.S. facility on the 18th, 19th and 31st of January, 1978. At those hearings, the parties addressed themselves to the Motion for Preliminary Injunction, and also to a related Motion for Permanent Injunction. In addition to the hearings, two stipulations were filed on the 15th and 21st of February 1978, to expedite the court's fact finding process. Final briefs were filed by March 3, 1978, and from all of the above sources, the following facts were found.

### FINDINGS OF FACT

1. At approximately 9:00 p. m. on November 10, 1977, the body of Alfred Chisholm (hereinafter referred to as Chisholm) was found in a laundry cart in the gymnasium area of C.C.I.S. Chisholm, a black man, had been an inmate confined in that institution. It was immediately apparent to the prison authorities, primarily because of bloodstains on Chisholm's body and clothing, that the death was the result of an act constituting some degree of criminal homicide. The medical examiner's report,[2] issued two days later, concurred with the authorities' suspicion of homicide, stating the cause of death to be "ASPHYXIA BY STRANGULATION. HOMICIDE."

2. The State Police for the State of Connecticut were called to investigate the death immediately after the body was found.

3. At approximately 10:30 p. m. on November 10, 1977, (one and one half hours after the body of Chisholm was found), plaintiff, Frank A. Passalacqua (hereinafter referred to as Passalacqua),[3] a white man, was escorted from his cell in the general population of C.C.I.S. to an interview room within the prison. There he was questioned by the State Police about the apparent homicide for approximately two hours. Following this questioning, Passalacqua was escorted to F Block within C.C.I.S., a section of the prison used for housing prisoners assigned to administrative segregation (hereinafter referred to as F Block).[4] When Passalacqua asked the prison authorities why he was being transferred, he was told only that he was "under investigation."[5]

4. At approximately 11:00 a. m. on November 14, 1977, the plaintiff Salvatore I. Raffone (hereinafter referred to as Raffone),[6] a white man, was escorted from his work assignment in the gymnasium of C.C.I.S. to F Block. Prior to this transfer, he was in the general population of the prison. When Raffone asked why he was being transferred, the escorting officer told him: "I'm not allowed to tell you anything."[7]

5. At approximately 10:00 a. m. on November 15, 1977, the plaintiff Richard F. McAlister (hereinafter referred to as McAlister),[8] a white man, was escorted from his

2. Autopsy Report of autopsy performed on the body of Alfred Chisholm on November 12, 1977, by Catherine A. Galvin, M. D., Associate Medical Examiner for the State of Connecticut.

3. Plaintiff Passalacqua is presently serving a term of two to five years for a conviction on two counts of second degree assault.

4. C.C.I.S provides for four types of segregated confinement. They are from least restrictive to most restrictive: administrative detention, administrative segregation, punitive segregation and isolation. State of Connecticut Department of Corrections, *Administrative Directives*, Chapter 2.6(a), "Types of Segregation," pages 1 2.

5. Record of Hearings, at 17.

6. Plaintiff Raffone is presently serving terms of seven to fourteen years and two to five years for convictions on first degree robbery and first degree unlawful restraint, consecutively. He had several previous felony convictions.

7. Record of Hearings, at 129.

8. Plaintiff McAlister is presently serving two consecutive life sentences for second degree murder. He had previous felony convictions.

work assignment in the gymnasium of C.C. I.S. to F Block. Prior to this transfer, he was in the general population of the prison. At the time of the transfer, McAlister did not ask why he was being transferred, and no explanations were offered to him.

6. In the afternoon of November 15, 1977, the plaintiff Anthony T. Kozlinski (hereinafter referred to as Kozlinski),[9] a white man, was escorted from his work assignment in the electronics shop of C.C. I.S. to F Block. Prior to this transfer, he was in general population of the prison. The explanation offered by the escorting officer was that Kozlinski "was going to segregation under investigation by the State Police." [10]

7. Immediately upon entering F Block, each plaintiff was asked to remove his clothing and then was given a uniform brown jumpsuit. They were then locked in separate cells in F Block without any of their personal belongings.[11] From the time of their original confinements in F Block through the time of this writing, plaintiffs McAlister, Kozlinski and Passalacqua have been uninterruptedly assigned to F Block. Plaintiff Raffone was uninterruptedly assigned to F Block until recently when he was transferred to E Block, a similar administrative segregation area.

8. The four plaintiffs, while in administrative segregation, are enjoying substantial deprivations of the privileges which they enjoyed while they were in the general population. Among the objectively measurable differences between the general population and F Block (the same being true for E Block) are:

a.) in F Block, the plaintiffs are locked in their cells for 23 hours per day on weekdays and 24 hours per day on weekends; while in the general population they are generally locked in their cells only for eight hours each night;

b.) due to the number of hours the plaintiffs are locked in their cells in F Block, their contact with other prisoners is drastically less than it was in general population when they were allowed to be in the company of other prisoners for up to sixteen hours per day;

c.) meals are eaten by the plaintiffs alone in their cells, while in general population, meals were eaten with other prisoners;

d.) two showers per week are allowed in F Block (although sponge bathing is always available at the sinks in the plaintiffs' cells), while at least one shower per day was allowed in general population;

e.) plaintiffs must order books (including legal publications) one at a time from the library, while in general population they could enter the library during their recreation periods;

f.) no organized religious services are allowed in F Block (although clergymen regularly come to F Block to meet individually with the prisoners), while they are provided in the general population;

g.) no post-high school educational services (excepting correspondence courses) are available in F Block, while such services are available in general population;

h.) many recreational opportunities which were available in the general population (e. g., movies, hobby shop privileges) are not available in F Block; and

i.) no opportunities for employment are available in F Block, while such opportunities were readily available in the general population.

9. In addition to these objectively measurable differences, the plaintiffs are experiencing psychological and sociological deprivations resulting from their segregation from other prisoners which have not been measured.

10. On November 22, 1977, each of the four plaintiffs were separately brought be-

---

9. Plaintiff Kozlinski is presently serving a term of seventy-five to one hundred twenty-five years for burglary and robbery. He had several previous felony convictions.

10. Record of Hearings, at 95–6.

11. Some of their personal belongings were subsequently returned to them. See Findings of Fact, paragraph 12.

fore the Classification Committee of C.C. I.S.[12] The Classification Committee is composed of Assistant Warden Singer, Assistant Warden Cybulski and Correctional Counselor Supervisor Orzak. It was the purpose of each Classification Committee hearing to discuss with each plaintiff his status in segregation and any changes that could be made concerning that status. It was not a disciplinary hearing.

11. None of the plaintiffs received any form of written notice of the November 22nd hearing. Oral notice was given to each plaintiff, five to ten minutes before his hearing, that the hearing would take place. However, the plaintiffs were not told what the purpose of the hearing was, nor were they told of any reason why they were being held in segregation. In short, the plaintiffs were given no chance to prepare any information to present to the Classification Committee on their own behalf because: (a) there was no time to prepare and, (b) even if there was time to prepare, they did not know what the hearing was going to be about. The plaintiffs knew only that their confinement in segregation was related to the Chisholm investigation.

12. Each of the November 22nd hearings lasted approximately ten to fifteen minutes. During the hearings, the plaintiffs were told that they were being confined in segregation pending the Chisholm investigation. They were further informed that since it was apparent to the prison authorities that the investigation was going to last for quite some time, the Committee would recommend that the plaintiffs should be given at least some of the benefits they enjoyed while in the general population (e. g., recreation and some of the plaintiffs'

personal belongings such as televisions and radios). The plaintiffs were finally told that because of the anticipated length of the investigation, the Committee would recommend that their official status in F Block was being changed from "holding" to "administrative segregation." [13] Their actual status, excepting the privileges mentioned above, would stay the same. The plaintiffs were asked if they had anything to say regarding their privileges within F Block. They were never told, however, that they could call witnesses on their behalf, present evidence, or have any form of legal or paralegal counsel present. None of the plaintiffs asked for any of these rights. The prison authorities offered no evidence or reasons why the plaintiffs should be confined in F Block other than that they were to remain there during the entire Chisholm investigation by the State Police.

13. Shortly after the November 22nd hearings, each plaintiff received a letter from the prison authorities informing him that he was to remain in administrative segregation "for investigation purposes" until the investigation was completed.[14]

14. At no time since the November 22nd hearings have any of the plaintiffs been formally or informally accused of committing any crime or violation of prison rules or practices.

15. During the period of time from the November 22nd hearings through the hearings conducted in connection with the present litigation (January 18, 19, and 31, 1978) all four plaintiffs inquired, both orally and in writing, of the prison authorities as to why they were being confined in F Block. These inquiries included a specific

---

12. Such a hearing is required to be held "within ten working days of such placement." State of Connecticut Department of Corrections, *Administrative Directives*, Chapter 2.6(a), "Types of Segregation," page 1.

13. "Holding" is the classification given to prisoners when they are first transferred to areas of the prison designated for "administrative segregation." (e. g., F Block). If the prison authorities decide that they are to be continued in segregated confinement, their official status is changed to "administrative segregation."

14. All four letters were substantially the same. The text of the letter to Kozlinski read:

"The information I have received is that you are in adm/seg for investigation purposes and that you will remain there until the investigation is completed. The state police have some of your personal property, however, every other item you are allowed in adm/seg you have."

s/ Mike Rubba

inquiry by Kozlinski of Assistant Warden Singer whether the plaintiffs were being held in F Block for their own protection. In response to each of these inquiries, the consistent and exclusive response was that they were being held "for investigation purposes."

16. In addition to the reason given to the plaintiffs as to why they were confined to F Block, the defendants had several other reasons why the plaintiffs were originally confined to F Block. When the State Police began their investigation of the apparent Chisholm homicide, the four plaintiffs were among six prisoners at C.C.I.S.[15] who were originally named by the State Police as prime suspects in that case. All six were white men, and as stated previously, Chisholm was a black man. The defendants felt that if the prison population, which is composed of roughly equal proportions of black and white prisoners, were to learn that these six men were prime State Police suspects in the Chisholm case, they would interpret the apparent homicide as being racially motivated. Given that interpretation, the defendants felt polarization along racial lines would occur and the physical safety of the six suspects, as well as the prison as a whole, would be in danger. Therefore, there were two reasons why the plaintiffs were originally segregated in F Block: (1) they were prime suspects in the Chisholm investigation, and (2) it was feared that the safety of the plaintiffs and the entire institution was in danger. Neither of these reasons were offered to the plaintiffs or in any other way made known to them prior to the hearings conducted in connection with the present litigation (January 18, 19 and 31, 1978).

17. While the court may only speculate about what would have happened had the plaintiffs never been placed in F Block, two of the six prisoners who were originally prime suspects (the two besides the plaintiffs) were quickly released from F Block back into the general population of the prison. Neither prisoner knew, at the time of their release, that they were prime suspects

in the Chisholm case. Neither prisoner was threatened or assaulted by any black prisoner (or white prisoner, for that matter) subsequent to his release. It is apparent, therefore, that merely being considered by the State Police as a prime suspect in the investigation was not enough to endanger the lives of these two prisoners.

18. In the days immediately following Chisholm's death, the defendants or their agents observed several objective factors which they believed were indicative of a heightening of racial tension within C.C.I.S. Specifically, these factors were:

a.) more small grouping than normal;

b.) certain inmates were moving from group to group;

c.) informants were speaking of a "militant element" within the black population which wanted to immediately retaliate against the white inmates in general;

d.) the Sunday religious service three days after Chisholm's death was "colder" than usual;

e.) a search of the gymnasium area on the night of Chisholm's death revealed no weapons while a similar search on the following Monday revealed several hidden weapons; it was believed by the defendants that if a black/white incident was to occur, it would take place in the gymnasium area;

f.) in the days immediately following the Chisholm death, significantly less prisoners than normal participated in evening recreation; this was interpreted by the defendants to mean that prisoners feared or did not want to become involved in any possible black/white confrontation;

g.) on the days immediately following Chisholm's death, the defendants received information that the plaintiffs' names were being prominently mentioned as suspects;

h.) after the plaintiffs were placed in segregation, the number of prisoners participating in evening recreation increased.

19. In addition to these objective factors, defendant Warden Robinson testified that he had a subjective feeling of racial tension within C.C.I.S.

---

**15.** The other two prisoners were Arthur Davis and Charles Crawford.

20. Since three of the four plaintiffs were in the general population for the four days immediately following Chisholm's death, and since no assault or threat of assault was acted out against them, it seems as if the black prisoners' animosity was directed more at the white population as a whole rather than at the plaintiffs in particular, or at least acting out was not the chosen alternative.

21. Decisions to continue prisoners in administrative segregation at C.C.I.S. are first recommended by the Classification Committee, then approved, modified or rejected by the Warden, and finally approved, modified or rejected by the Commissioner.

22. The plaintiffs were informed shortly after the November 22nd Classification Committee hearings that they were to remain in segregation indefinitely "for investigation purposes" (see paragraph 13, *supra*). However, the real reasons for the Classification Committee's recommendation to the Warden that the plaintiffs be continued in administrative segregation were: (1) they were prime suspects in the Chisholm investigation, and (2) it was feared that the safety of the plaintiffs and the entire institution was in danger. These reasons were the same as those which were the basis for the defendants' original decision to place the plaintiffs in administrative segregation (see paragraph 16, *supra*).

23. The Warden and Commissioner approved the Classification Committee's recommendation for the same reasons.

24. The plaintiffs were not told the real reasons for their confinement in administrative segregation because the defendants believed that further racial "polarization" would result.

25. The defendants are still of the belief that if the plaintiffs were released back into the general population, the safety of the plaintiffs and the entire institution would be in danger. However, defendant Warden Robinson also testified that the conditions of the prison and the racial tension are "back to normal" [16] (normal being the conditions as they existed prior to the Chisholm death).

26. Three black inmates, who together know a large percentage of the black prison community at C.C.I.S., testified that they had not heard any rumors circulating among the black prisoners of any threats of planned retaliation against any of the four plaintiffs.

27. From all of the evidence presented by affidavits, testimony at the hearings and by stipulation, the court finds that if the plaintiffs were released back into the general population of the prison at C.C.I.S., they and/or the prison community as a whole would not be subjected to any greater danger in connection with the Chisholm death than they would be as a normal incident to incarceration in a maximum security prison.

28. While McAlister, Kozlinski and Raffone have not been granted parole status, Passalacqua was granted parole on November 8, 1977, to be effective January 12, 1978. The January 12th release date was conditioned upon acceptance of Passalacqua by the State of New York for parole. On January 10, 1978, the State of Connecticut Board of Parole voted to suspend Passalacqua's release date "pending the disposition by United States District Court of [the instant litigation]." [17]

---

16. Record of Hearings at 315.

17. The full text of the letter from the State of Connecticut Board of Parole to Passalacqua read:

"Dear Mr. Passalacqua:
This is to advise you that the Board of Parole on January 10, 1978, voted to suspend your parole release date pending the disposition by United States District Court of your petition. Further information concerning this will be found in the enclosed copy of my letter to your attorney, James E. Diorio. Please note that the Board has taken no action concerning voting you parole and has only suspended your release date."

s/ J. Bernard Gates
Chairman

The proposed receiving State, New York, was notified of this suspension. Perhaps because of this suspension, the State of New York has not, as of the date of this opinion, agreed to accept Passalacqua for parole.

29. The defendants have presented no evidence of probable cause to believe that the plaintiffs killed Chisholm.[18]

30. When questioned under oath by counsel for the defendants (at the hearings conducted in connection with the present litigation) about their involvement in the Chisholm death, all four plaintiffs invoked their right not to answer pursuant to the Fifth Amendment of the Constitution of the United States.[19]

31. No plaintiff who was entitled to statutory "good time" credits [20] has lost any because of his confinement in administrative segregation status.

32. Plaintiffs' monetary losses resulting from their confinement in administrative segregation status have been nominal.[21]

## DECLARATION OF RIGHTS

The plaintiffs in the instant case argue that the deprivations they are experiencing as a result of their indefinite confinements in administrative segregation rise to a level of constitutional significance which should be recognized by this court. As such, they argue the defendants should be put to the test of producing "substantial evidence" that the plaintiffs' continuance in administrative segregation is justified. They argue further that no such "substantial evidence" has been produced by the defendants either before or at the hearings connected with the present litigation, and therefore, should be released from administrative segregation back into the general population at C.C.I.S. Finally, they argue they are entitled to money damages as a matter of law.

The defendants, on the other hand, argue that the deprivations cited by the plaintiffs, when viewed in the light of a maximum security prison environment, do not rise to a level of constitutional significance. Therefore, no "substantial evidence" need to have been presented either before or at the hearings connected with the present litigation. They alternatively argue that even if they are put to the test of producing "substantial evidence," the plaintiffs' status as prime State Police suspects coupled with the danger to the plaintiffs and the prison community as a whole constitute "substantial evidence" of the need to continue the plaintiffs in administrative segregation. They argue finally that the defendants were at all times acting in "good faith" and therefore, no money damages should be assessed against them.

■ It is a long standing and viable principle that federal courts allow state prison authorities a great deal of latitude in conducting the day-to-day affairs of prison administration. *Numer v. Miller, et al., supra: United States ex rel. Knight v. Ragen, et al., supra: Jones, et al. v. North Carolina Prisoners Labor Union, Inc., etc.,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). This latitude to make decisions is absolutely necessary if prison administrators are to run an efficient and secure system of incarceration.

However, federal courts will not hesitate to intervene when the constitutional rights of prisoners are put in jeopardy. "[T]hough his rights may be diminished by the needs and exigencies of the institutional environment a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime. There is no iron curtain drawn between the constitution and the

---

18. In the stipulation filed on February 21, 1978, both parties agreed that Raffone told the State Police that two other prisoners killed Chisholm and that he helped Chisholm's assailants put the body in the laundry cart.
 However, the stipulation also provided that he later "flunked" a lie detector test of this story.

19. This decision by the plaintiffs was made on the advice of Attorney James Diorio, who represented the plaintiffs for any criminal ramifications of the hearings conducted in connection with the present litigation.

20. 1976 Conn.Legis.Serv., Public Act No. 76–358, June 9, 1976.

21. The plaintiffs presented evidence that they constructed and sold pieces of wooden furniture while they were in the general population of the prison, and that because of their segregation, they were deprived of the opportunity for such sales. However, the evidence presented was too indefinite to establish any actual damages.

prisons of this country." *Wolff v. McDonnell*, 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974). Deprivations which have risen to a level of constitutional significance such that federal courts have demonstrated a willingness to intervene include, *inter alia*: deprivation of medical care, *United States ex rel. Knight v. Ragen, et al., supra*; disciplinary transfers, *Aikens, et al. v. Lash, et al.*, 547 F.2d 372 (7th Cir. 1976); deprivation of "good time" credits, *Wolff, supra*; and denial of pardon, *Dumschat v. Board of Pardons, State of Connecticut, et al.*, 432 F.Supp. 1310 (D.Conn.1977). The purpose of these interventions has been to assure that the decisions of prison authorities, in areas involving constitutional rights, are not made arbitrarily. *Sostre v. McGinnis, et al.*, 442 F.2d 178 (2d Cir. 1971); *cert. den. sub nom. Sostre v. Oswald et al.*, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972), *cert. den. sub nom. Oswald et al. v. Sostre*, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972).

The court is convinced that immediately after the Chisholm death, the defendants had information available to them which reasonably could have led them to believe that racial tensions within C.C.I.S. were higher than normal (see Findings of Fact, paragraphs 18 and 19, *supra* ). It is at times such as these that prison authorities must be free to act quickly to dissipate the tension as fully as possible. If the initial decisions are saddled with the threat of federal judicial intervention in such situations, some of that freedom will be lost and the safety of the institution will be further endangered. However, by the time the hearings connected with the present litigation were held, more than two months had elapsed since the initial transfers. That time had increased to more than three months by the time final briefs were submitted and no end is in sight. The substantial deprivations which the plaintiffs are experiencing over an indefinitely long period of time invite the court to look more closely at the chronology of events to determine whether the plaintiffs constitutional rights have been adequately protected.

The plaintiffs allege deprivations of a panoply of rights, privileges and immunities guaranteed to them by the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.[22] The most serious of these deprivations, and ones which by their own force will be dispositive of this case, are contained in the Fourteenth Amendment: "No State shall . . . deprive any person of . . . liberty . . . without due

---

**22.** Plaintiffs' *Causes of Action* were:

"*Count I*—The acts and omissions of the defendants described above prohibit the plaintiffs, jointly and severally, from the free exercise of religion and abridge their freedom of speech and their right peaceably to assemble in violation of the First and Fourteenth Amendments to the Constitution of the United States.

*Count II*—The acts and omissions of the defendants described above constitute a seizure of their respective persons without probable cause, compel each of them to be a witness against himself in a criminal case, and deprives each of them of his right to a speedy and public trial, to be informed of the nature and cause of the accusation against him, to have the assistance of counsel for his defense, in violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States.

*Count III*—The acts and omissions of the defendants described above inflict cruel and unusual punishment on the plaintiffs, jointly and severally, in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States.

*Count IV*—The acts and omissions of the defendants described above deny the plaintiffs, jointly and severally, the equal protection of the laws in violation of the Fourteenth Amendment to the Constitution of the United States.

*Count V*—The acts and omissions of the defendants described above have deprived the plaintiffs, jointly and severally, of substantial liberties without any sort of hearing or due process of law in violation of the Fourteenth Amendment to the Constitution of the United States.

*Count VI*—The standards pursuant to which the defendants have placed and are confining the plaintiffs, jointly and severally, in segregation are so vague as to violate the Fourteenth Amendment to the Constitution of the United States."

Plaintiffs' *Amended and Consolidated Complaint for Declaratory, Injunctive and Monetary Relief*, at 10–12.

process of law; nor deny to any person within its jurisdiction the equal protection of the laws." It is not strictly necessary, for purposes of the injunctive and monetary relief, to decide upon the other constitutional claims. Thus, they will not be considered at this time.

■ In viewing the due process claim, the initial question is whether a "liberty" interest protected by the Fourteenth Amendment is at stake. *Morrissey v. Brewer*, 408 . U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). When the plaintiffs were transferred from general population to administrative segregation, they lost many of the freedoms, privileges and responsibilities which they previously enjoyed (see Findings of Fact, paragraph 8 *supra*). The Second Circuit has consistently held such transfers to deprive prisoners of Fourteenth Amendment "liberty" interests. *Carter v. McGinnis, supra; Davis v. Lindsay*, 321 F.Supp. 1134 (S.D.N.Y.1970); *United States ex rel. Walker v. Mancusi*, 338 F.Supp. 311 (W.D.N.Y.1971) aff'd, 467 F.2d 51 (2d Cir. 1972); *United States ex rel. Robinson v. Mancusi*, 340 F.Supp. 662 (W.D. N.Y.1972); *Powell v. Ward*, 392 F.Supp. 628 (S.D.N.Y.1975), *modified on other grounds*, 542 F.2d 101 (2d Cir. 1976).

The defendants argue that in non-disciplinary transfers to segregation, the position of the Second Circuit is effectively overruled by *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and a recent interpretation of *Meachum, Daigle v. Hall*, 564 F.2d 884 (1st Cir. 1977). The Supreme Court held in *Meachum* that *inter-prison* transfers within the same state did not deprive a prisoner of a due process "liberty" interest, absent some state law or practice which makes such transfers dependent upon the occurrence of specified events, even if the transferee prison has a higher security status than the transferor prison. This holding has been interpreted in the First Circuit to apply to *intra-prison* transfers from general population to administrative segregation. This court respectfully disagrees with the First Circuit's interpretation.

In *Meachum, supra*, the court reasoned that once a person is convicted of a crime and sentenced to a term of incarceration in a state prison, the sentencing court may assign that person to any prison within its jurisdiction. Further, a state is not required to have more than one prison. Therefore, the state had the power to originally assign any of the plaintiff prisoners in that case to any of the transferee prisons. Whether that assignment occurred immediately after sentencing or at some point during the sentence made no substantial difference. The court further reasoned that transfers between prisons were "made for any variety of reasons", and were "not conditioned upon the occurrence of specified events." *Meachum, supra* 427 U.S. at 225, 226–7, 96 S.Ct. at 2538, 2539. These two lines of reasoning brought the court to the conclusion that "[w]hatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all."

The instant case is distinguishable from *Meachum, supra*, along either of its paths of reasoning. While a convicted criminal in Connecticut may among other alternatives, be sentenced to any prison in the state, it is not within the sentencing judge's discretion to assign that criminal to administrative segregation within a particular prison. Conn.Gen.Stat. §§ 54–77, *et seq.* Prisoners are incarcerated in the general population of prisons unless the prison administrators assign them to a higher security status (see Findings of Fact, paragraph 21, *supra.*) Placement of a prisoner in administrative segregation involves a deprivation of "liberty" which is once removed from, and certainly far more restrictive than, any possible original sentence ordered by a judge in Connecticut. This is one distinction between the instant case and *Meachum.*

There is also another distinction. While transfers in *Meachum, supra*, were "not conditioned upon the occurrence of specified

events" (at 226–7, 96 S.Ct. at 2539), the *Administrative Directives* promulgated by the defendant Manson provide explicit conditions under which a prisoner may be transferred from general population to administrative segregation:

*Administrative Segregation*

Inmates may be placed in administrative segregation for any of the following reasons:

(a) At the inmates own request.

(b) For protection of self or others or for the welfare of the institution community.

(c) Inmates who after punitive treatment still cannot reasonably and safely be returned to the regular inmate population.

State of Connecticut Department of Corrections, *Administrative Directives*, Chapter 2.6(a), page 1.

The significance of such a directive is that it creates an expectation on the part of a prisoner that he will not be placed in administrative segregation so long as none of these three conditions exist. This creates more than the "ephemeral and insubstantial" expectation which was dismissed in *Meachum* ; it creates a right.

 While the court need not decide whether either of these distinctions are alone sufficient to remove the instant case from the reasoning of *Meachum, supra*, it is clear that when taken together, they are quite sufficient. The sufficiency of distinctions similar to the ones outlined above was recently considered by the Supreme Court. In the case of *Wright et al. v. Enomoto et al.*, 462 F.Supp. 397 (N.D.Calif.1976), many of the plaintiffs, and the class they represented, were confined, "in maximum security units for 'administrative' reasons" (at

399). Self protection, institutional protections and under investigation for murder were among the many reasons why the plaintiffs and members of their class were segregated. As in the present case, the court in *Wright* found the conditions of segregated confinement to be substantially more burdensome than the conditions in general population. That court also found that administrative regulations, similar to the ones listed above,[23] clearly articulated the circumstances under which a prisoner may be transferred to segregation for "administrative" reasons. Considering the conditions and the regulations, the court in *Wright* found a due process "liberty" interest was at stake. Their decision was affirmed without opinion by the Supreme Court[24] in *Enomoto v. Wright*, 434 U.S. 1052, 1054, 98 S.Ct. 1223, 1224, 55 L.Ed.2d 756 (1978). Following the consistent position taken in the Second Circuit and the recent Supreme Court affirmance of *Enomoto, supra*, this court holds that the transfer of the plaintiffs in the instant case from general population to administrative segregation, and continued maintenance therein, did deprive and is depriving the plaintiffs of a "liberty" interest protected by the Due Process clause of the Fourteenth Amendment.

 Given the existence of a due process liberty interest, "the question remains what process is due. . . . [D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer, supra*, 408 U.S. at 481, 92 S.Ct. at 2600. The three-judge District Court in *Enomoto, supra*, considered what process was due in the case of transfers to segregation for "administrative" reasons and, as was previously noted, their judgment was recently affirmed by

23. "In its most recent version, Chapter 4, Article 6 of the rules and regulations of the Director of Corrections provides:

§ 3330. General Policy. (a) Inmates must be segregated from others when it is reasonably believed that they are a menace to themselves and others or a threat to the security of the institution. Inmates may be segregated for medical, psychiatric, disciplinary, or

administrative reasons. The reason for ordering segregated housing must be clearly documented by the official ordering the action at the time the action is taken." *Enomoto, supra*, at 403.

24. This case was heard by a three-judge District Court pursuant to 28 U.S.C. § 2281. A direct appeal to the Supreme Court was taken pursuant to 28 U.S.C. § 1253.

the Supreme Court. The District Court reasoned that a transfer for *administrative reasons* was at least as, if not more, grievous than a transfer for *disciplinary reasons*:

> The latter is for a definite term . . . In contrast, administrative segregation is for an indefinite period—the prisoner may be confined for months, even years, without hope of release. The charges at a disciplinary hearing are definite and narrow. The inmate is accused of violating a prison rule. In contrast, . . . the charges at a hearing resulting in administrative confinement tend to be vague, and are frequently based on mere rumor, suspicion, or conjecture. *Enomoto, supra*, at 403–04.

As such, the court reasoned, the procedures required for *disciplinary* segregation were the minimum that were required for *administrative* transfers.[25]

The District Court then noted that the procedures required of prison authorities when prisoners are deprived of "good time" or placed in segregated confinement for *disciplinary* reasons have been considered by the Supreme Court in *Wolff v. McDonnell, supra*. The Supreme Court in *Wolff* held that such prisoners have a constitutional right to be given:

a.) an opportunity to appear before the decision-making body;

b.) written notice of the charge against the prisoner at least twenty-four (24) hours in advance of the hearing;

c.) an opportunity to present witnesses and documentary evidence "when [it] will not be unduly hazardous to institutional safety or correctional goals" (*Wolff, supra*, 418 U.S. at 566, 94 S.Ct. at 2979);

d.) a written statement of the reasons for the decision and the evidence upon which that decision was based; and

e.) if illiterate or if the issues are complex, an opportunity to have a fellow inmate or a member of the staff help prepare his defense. (This does not include the right to retained or appointed counsel). Given these procedures for *disciplinary* transfers, and because they found *administrative* transfers to be at least as grievous, the court concluded at least the same procedures were required for *administrative* transfers.

Of course, when circumstances arise which put a prisoner or the institution community in immediate danger, it would be an unreasonable burden on prison authorities to require that the procedures mandated in *Wolff, supra*, be provided before the prisoner is transferred. Recognizing this, the District Court in *Enomoto, supra*, held that in emergency situations, a hearing should be held within seventy-two (72) hours of the transfer, with written notice provided at least twenty-four (24) hours prior to the hearing. The court further held that "[i]n the event of a continuing emergency, such as a prolonged riot, which, in the good faith determination of prison officials, prevents notice and hearing as required above, said notice and hearing must be provided as soon as is practical." *Enomoto, supra*, at 405.

In view of the Supreme Court's affirmance of *Enomoto, supra*, this court holds that the plaintiffs, while still confined in administrative segregation, are entitled to the due process protections outlined in *Wolff, supra*.[26] This brings the court to a retrospection of the chronology of events

---

**25.** The court in the instant case is aware that for disciplinary violations, a prisoner may be placed under more onerous physical conditions than in administrative segregation, *viz.*, punitive segregation or isolation. However, in both punitive segregation and in isolation, there are definite and relatively brief time limitations which are provided for in the *Administrative Directives*, while no such limitations govern administrative segregation. Also, the charges are relatively narrow in disciplinary proceedings, while the reasons for placing a prisoner in administrative segregation may be broader based (e. g., welfare of institution community).

**26.** The District Court in *Enomoto, supra*, did not decide whether future hearings were required of prison authorities if prisoners were segregated for indefinitely long periods of time. Since the plaintiffs have been segregated for more than three and one-half months, the importance of subsequent hearings becomes clear. However, since the parties do not raise the issue, the court will not decide it.

surrounding the plaintiffs transfer to and continued maintenance in administrative segregation in order to determine whether the defendants responsibilities of due process have been discharged. In so reviewing the defendants' actions, the court does not imply that the defendants did or should have, known that the above-outlined procedures were constitutionally mandated. Indeed, if the First Circuit Court of Appeals in *Daigle v. Hall, supra,* could not predict how the Supreme Court would rule on administrative transfers, we can hardly expect more of the defendants.

It is clear that the plaintiffs were not given notice or a hearing before they were transferred to administrative segregation. It is equally clear that the Classification Committee hearing of November 22, 1977, and the notice given prior to that hearing were constitutionally deficient when compared to the procedures held to be required in *Enomoto, supra,* in that:

a.) notice of the hearing was given only five or ten *minutes* prior to the hearing, while notice at least twenty-four (24) *hours* prior to a hearing is required;

b.) that notice was oral and did not inform the plaintiffs of the reasons why the defendants decided to transfer them to, and continue them in, administrative segregation, while both of these procedures are required;

c.) the plaintiffs were only given a written statement that they were being continued in administrative segregation, while a written statement of the reasons for the transfer and continued maintenance were required;

d.) while the defendants did not expressly deny any plaintiff the opportunity to present witnesses and documentary evidence, or to have a fellow inmate or member of the staff help prepare his defense, the short notice of the hearing, together with the failure of the defendants to make that plaintiff aware of these opportunities, effectively deprived him of the opportunities.

The primary result of these deficiencies was to deny the plaintiffs of a meaningful opportunity to be heard on the real reasons why they were being continued in administrative segregation: (1) their status as prime State Police suspects in the Chisholm investigation, and (2) the defendants belief that the safety of the plaintiffs and the entire institution was in danger.

The defendants argue that if the plaintiffs were informed of the real reasons for their confinement, further "racial polarization" would occur in the institution and the safety of the plaintiffs and the entire institution would have been further endangered. While not deciding whether such circumstances could, hypothetically, relieve the defendants of their duty to inform prisoners of the real reasons for their segregation, the court holds that, in the present case, the defendants did not persuade the court that such further "polarization" would occur if the instant plaintiffs were told the reasons for their segregation. Indeed, it seems just as likely that the transfer of the plaintiffs in and of itself was responsible for their being thought of by the institution community as suspects in the Chisholm investigation.

By not providing a hearing as required in *Enomoto, supra,* the defendants invite the court to determine whether the plaintiffs were denied the "equal protection of the laws" which they are guaranteed by the Fourteenth Amendment to the United States Constitution. After deciding that a "liberty" interest was at stake, two districts in the Second Circuit have held that "substantial evidence" is required to be produced by prison authorities to justify confinement of prisoners in administrative segregation. *Carter, supra,* at 1097; *Davis, supra,* at 1139. This standard strikes a balance between "mere reasonableness" and "strict scrutiny' standards which justly takes into account the needs of both the prisoners and the prison authorities. The prisoners, who face the substantial deprivations of administrative segregation, need protection against arbitrary state action. There should be substantial reasons why prisoners are so deprived. On the other hand, prison authorities must operate under

a system where they receive little or no cooperation from the prison community. In addition to making decisions on what has happened, they must try to predict what will happen to subject their decision-making process to a "strict scrutiny" standard would be unreasonably burdensome.

In the instant case, the court is not in a position to determine whether "substantial evidence" could have been presented by the defendants prior to the hearings conducted before the court on January 18, 19 and 31, 1978. Rather it considers only the evidence presented by the parties at those hearings. As justification for their decision, the defendants testified as to many objective factors which they observed immediately subsequent to the Chisholm death in November 1977. Defendant Robinson also testified that he had a subjective feeling of heightened racial tension within C.C.I.S. at that time. However, Robinson also testified that these factors were "back to normal" by the time the hearings were held before this court. On the other hand, plaintiffs presented several witnesses, including two who were originally State Police suspects in the Chisholm investigation, who testified that they heard of no threats or plans of retaliation among the black community at C.C.I.S.

Counsel for the defendants also asked the plaintiffs under oath whether they were involved in any way with the Chisholm death. The plaintiffs invoked their Fifth Amendment rights and refused to answer. The defendants argue that the court may draw an "adverse inference" from these refusals that the plaintiffs were involved in the Chisholm death in some way. In support of this proposition, the defendants cite *Baxter et al. v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). While the defendants' reliance upon *Baxter* is correct as far as it goes, it does not go far enough. The Supreme Court in *Baxter* held *inter alia*, that while an adverse inference may not be drawn from a defendant's refusal to testify in criminal proceedings against him, *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), such an inference may be drawn in prison

disciplinary proceedings. However, under the laws of the State of Rhode Island, where the disciplinary proceeding in issue took place, "an inmate's silence in and of itself is insufficient to support an adverse decision by the Disciplinary Board." *Baxter*, 425 U.S. at 317, 96 S.Ct. at 1557. The prison authorities were required to produce evidence, *independent* of the prisoner's refusal to answer, in order to find him guilty of the disciplinary offense. Indeed, if an adverse inference could alone support a finding of guilt or involvement in a disciplinary offense, the burden would be on the prisoners accused of the offense to prove that they were innocent. This is contrary to the American system of justice at any level of disciplinary proceedings. Turning back to the instant case, the defendants produced absolutely no evidence of any involvement of the plaintiffs in the Chisholm death. Any adverse inference that may be drawn, unsupported by independent evidence, is unconvincing.

In weighing the evidence offered by both parties concerning the protection of the plaintiffs and the prison community against danger, and the purported involvement of the plaintiffs in the Chisholm death, the court is unconvinced of the need of continuing the plaintiffs in administrative segregation. The evidence falls far short of being "substantial." As such, the court holds that the plaintiffs are entitled to be released from administrative segregation and allowed back into the general population of the prison.

The plaintiffs also claim they are entitled to damages under 42 U.S.C. § 1983. In light of the Supreme Court's recent decision in *Procunier et al. v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978) this court holds that they are not so entitled. In *Procunier*, the Supreme Court held that a "qualified immunity" is available to prison officials unless: (1) "the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of that right and if they knew or should have known that their conduct violated the

constitutional norm," *Procunier*, 434 U.S. at 562, 98 S.Ct. at 860, or (2) if they acted with malice.

As has been previously discussed, there was no "clearly established" right of the defendants to the notice and hearing described herein prior to the hearings conducted in connection with the present litigation. *Meachum, supra*; *Daigle, supra*. Further, the defendants were not required to predict what the future course of constitutional law would mandate. *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). It is equally clear that the defendants' actions were not motivated by malice. Their intention was to protect the safety of the plaintiffs and the institution community. This decision does not change that intention. The plaintiffs request for monetary damages is denied.

## ORDER

In view of the results reached in the Declaration of Rights, it is therefore:

ORDERED, that the defendants shall release the plaintiffs from administrative segregation back into the general population at C.C.I.S. By so ordering, the court does not preclude the defendants from any of the following:

a.) transferring any or all of the plaintiffs to another prison;

b.) releasing plaintiff Passalacqua on parole; or

c.) conducting a future hearing to consider whether conditions have substantially changed since the hearings conducted in connection with the present litigation, so long as the procedures followed conform to the standards as set forth above and "substantial evidence" is presented by the defendants of the need for administrative segregation.

This order does not preclude any of the plaintiffs from requesting to remain in administrative segregation, if they so desire.

CLARIE, Chief Judge.

The court affirms, ratifies, and adopts the foregoing findings of fact and conclusions of law, as set out in the Magistrate's memorandum.

·So ordered.