Hurlburt **DOLPHIN**

v.

John **MANSON**, et al.

**Civ. No. H–82–203 (JAC).**

United States District Court, D. Connecticut.

Jan. 8, 1986.

---

Edward F. Hennessey, Robinson & Cole, Hartford, Conn., for plaintiff.

Cornelius F. Tuohy, Asst. Atty. Gen., Hartford, Conn., for defendants.

### RULING ON MOTION FOR SUMMARY JUDGMENT

JOSÉ A. CABRANES, District Judge:

This action by a state prisoner against state prison officials is before the court on the defendants' motion for summary judgment.

Hurlburt Dolphin, an inmate at the Connecticut Correctional Institution at Somers, Connecticut ("CCI–Somers"), commenced this action on February 23, 1982, with the filing of a complaint against John R. Man-

son, Commissioner of Correction for the State of Connecticut; Raymond M. Lopes, Deputy Commissioner of Correction; Carl Robinson, Warden of CCI–Somers; and Steven A. Tozier, a correctional lieutenant at CCI–Somers with responsibility for the prison's administrative segregation unit.[1]

The plaintiff contends that the defendants deprived him of his rights to equal protection and due process under the Fourteenth Amendment to the United States Constitution by transferring him from the New Haven Community Correctional Center ("NHCCC") to CCI–Somers during his pre-trial detention on robbery charges and by placing him in the administrative segregation unit, known as "F–Block," at CCI–Somers for 415 days preceding his conviction on those charges. He further contends that the defendants violated his due process rights as well as his Eighth Amendment right to be free from cruel and unusual punishment by continuing to confine him in the administrative segregation unit for an additional 490 days following his conviction.

The defendants assert in support of their motion for summary judgment that the plaintiff has failed to state a claim upon which relief can be granted under the United States Constitution. In addition, the defendants assert that, even assuming for the argument that the plaintiff was deprived of certain constitutional rights, they are immune from monetary liability because those rights were not "clearly established" under federal or state law. *See* Defendants' Memorandum of Law in Support of Motion for Summary Judgment (filed July 13, 1985) ("Defendants' Memorandum") at 6–8. The court having heard oral argument on the defendants' motion for summary judgment, and the parties having thereafter submitted revised statements of facts pursuant to Rule 9(c), Rules of Civil Procedure (D.Conn.), the defendants' motion is now ripe for decision.

---

1. Commissioner Manson and Warden Robinson died during the pendency of this action. The plaintiff's motion to substitute as party defendants the executrices/administratrices of the

Manson and Robinson estates was denied, without prejudice to renewal, pursuant to a colloquy with counsel, in open court and on the record, on May 2, 1984.

## I. Background

The plaintiff is currently serving a term of imprisonment at CCI–Somers of not less than nine years and not more than 18 years for the crime of robbery in the first degree. Defendants' Revised Statement Under Rule 9(c) (filed Aug. 23, 1984) ("Defendants' Statement") at ¶ 1. This sentence was imposed on the plaintiff by the Connecticut Superior Court, Judicial District of Hartford/New Britain, on October 28, 1982. *Id.* The plaintiff's criminal record contains earlier convictions for aggravated assault, assault with intent to kill, carrying a dangerous weapon and robbery in the first, second and third degrees. *Id.* at ¶ 7.

The plaintiff was arrested on March 22, 1981, on charges of robbery, larceny and possession of a sawed-off shotgun. Affidavit of Raymond M. Lopes (filed June 28, 1984) ("Lopes Affidavit") at ¶ 3(B). He was subsequently committed to NHCCC for failure to post the bond set by the court on those charges. *Id.* at ¶ 3(C). The state contends that the plaintiff escaped from custody while making a court appearance on April 21, 1981, and that he committed "several serious and violent crimes" before his recapture on July 2, 1981. Defendants' Statement at ¶¶ 10–12. The plaintiff, while not admitting the state's contentions, concedes that he was convicted of having escaped from custody on April 21, 1981; of having committed manslaughter on April 29, 1981, and of having participated in a robbery on May 27, 1981. Plaintiff's Revised Statement Pursuant to Local Rule 9(c) (filed Sept. 10, 1984) ("Plaintiff's Statement I") at ¶¶ 1, 4, 5. *See also* Affidavit of Lucille Vezina (filed June 28, 1984), Exhibits A (sentence imposed for robbery committed May 27, 1981), C (sentence imposed for manslaughter committed April 29, 1981), D (sentence imposed for escape from custody and assault on police officer committed April 21, 1981).

The plaintiff was transferred from NHCCC to CCI–Somers shortly after his return to custody on July 2, 1981. Defendants' Statement at ¶ 15. The defendants contend that the plaintiff was transferred to CCI–Somers, the state's only adult male maximum-security prison, because his escape and subsequent criminal activity demonstrated that he "posed an unreasonable security risk at NHCCC." *Id.* at ¶ 14. The plaintiff denies that he represented a security risk at NHCCC and contends that correctional officials deprived him of due process by transferring him to CCI–Somers without a hearing. Plaintiff's Statement I at ¶ 8.

The plaintiff was assigned upon his arrival at CCI–Somers to the quarantine/orientation housing unit, known as "G–Block," pending an investigation of his background and an assessment of whether he required any special programs or custodial safeguards. Defendants' Statement at ¶ 17. The defendants contend that the plaintiff was then placed in the protective custody unit, or "E–Block," as a result of the presence at CCI–Somers of the three Clinkscales brothers. The defendants assert that the Clinkscales brothers, who "were considered dangerous individuals and had a good many friends among the other inmates at CCI–Somers," held the plaintiff responsible for a 1974 fire at the Bridgeport Community Correctional Center that injured one of the brothers and "had threatened to retaliate against [the plaintiff]." *Id.* at ¶¶ 18–21. The defendants contend that the plaintiff was transferred, at his own request, from the protective custody unit in E–Block to the administrative custody unit in F–Block on August 31, 1981. *Id.* at ¶¶ 24–25.

The plaintiff appeared before the CCI–Somers Classification Committee on September 2, 1981, and asked to be released to the general prison population because he believed that he no longer required special protection. *Id.* at ¶ 26. The committee conducted a hearing into the plaintiff's request on September 8, 1981. *Id.* at ¶ 28. At the hearing, the plaintiff refused to answer when asked whether he had any problem with the Clinkscales brothers. *Id.* at ¶ 29. The committee recommended at the conclusion of the hearing that the plaintiff remain in administrative segregation in

F–Block because his release to the general population ."would create an unreasonable threat to the safety and welfare of the prison community." *Id.* at 28.

The plaintiff concedes that he "had a problem" with the Clinkscales brothers in 1975 but contends that he had no such problem in 1981 or thereafter. Plaintiff's Statement I at 14. The plaintiff first complains that "nobody talked to him or to the Clinkscales [brothers] while he was a pretrial detainee" to determine whether his release from administrative segregation would disrupt the general prison population, *id.,* but later concedes that he was given a hearing on his request for release to the general population and that he refused to discuss his relationship with the Clinkscales brothers at the hearing. *Id.* at ¶ 20. The plaintiff apparently made no effort to call any witnesses to testify at the hearing in his behalf. The plaintiff's continued confinement in administrative segregation was reviewed every 30 days by the Special Offenders Classification Committee, which was chaired by Lieutenant Tozier, and every 60 days by the overall Classification Committee and by Commissioner Manson or Deputy Commissioner Lopes. Plaintiff's Statement of Facts Which Are or May Be in Dispute (filed Sept. 10, 1984) ("Plaintiff's Statement II") at ¶¶ 27–28.

The parties do not dispute many of the conditions that prevail in the F–Block administrative segregation unit at CCI–Somers. Inmates are housed in single-man cells that measure approximately 6 feet by 9 feet and that are equipped with a bed, toilet, sink with hot and cold running water, a desk with desk lamp, and a stool. Defendants' Statement at ¶ 30. Inmates are allowed to have radios and television sets. (The plaintiff had both items during his confinement at F–Block.) *Id.* Inmates are provided with clothing and basic personal-grooming items, such as soap, towels, toothpaste, toothbrushes and toilet paper, and with the same food as is provided to the general population. *Id.* at ¶ 31. In addition, inmates are allowed three showers per week; one hour of exercise outside the cell on weekdays; visitation, correspon-

dence and telephone privileges similar to those of the general population, and access to prison chaplains, physicians, psychiatrists, legal materials and attorneys from the Connecticut Legal Assistance to Prisoners Program. *Id.* at ¶¶ 32–34. However, inmates confined to F–Block apparently have little opportunity to associate with other inmates or to participate in work, educational, social or recreational activities. Plaintiff's Statement II at ¶ 23.

The plaintiff remained confined in the F–Block administrative segregation unit at CCI–Somers from August 31, 1981, to March 2, 1984. Defendants' Statement at ¶ 35. The defendants contend that the plaintiff's prolonged confinement in administrative segregation was necessary because (1) all of the Clinkscales brothers were not transferred out of CCI–Somers until September 9, 1983; (2) Theodore Casiano, who had testified against the plaintiff at the robbery trial that resulted in his current incarceration, was also housed at CCI–Somers at various times after April 2, 1982; and (3) the plaintiff engaged in "numerous acts of serious misconduct" during his administrative segregation and thereby created an additional "threat to the good order and safety of the prison." *Id.* at ¶¶ 36–45. The plaintiff does not deny that the Clinkscales brothers and Casiano were incarcerated at CCI–Somers during the periods stated by the defendants or that he violated prison rules during his confinement in F–Block. Plaintiff's Statement I at ¶ 34. However, the plaintiff contends that prison officials should not have confined him to F–Block while permitting the Clinkscales brothers and Casiano to remain in the general population and should not have taken his misconduct into account in deciding whether to release him from administrative segregation.

## II. The Due Process Challenge

The plaintiff contends that the defendants violated his rights to substantive and procedural due process by transferring him from NHCCC to CCI–Somers and by placing him in administrative segregation prior

to his trial. In addition, he contends that the defendants further violated his right to procedural due process by continuing to confine him in F–Block following his conviction. The court will consider each of these contentions *seriatim.*

## A.

■ It is undisputed that a state is permitted to detain a person suspected of committing a crime prior to a formal adjudication of guilt. *See, e.g., Gerstein v. Pugh,* 420 U.S. 103, 114, 95 S.Ct. 854, 863, 43 L.Ed.2d 54 (1975). A violation of that person's right to substantive due process occurs only when the conditions of confinement "amount to punishment of the detainee." *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1872, 60 L.Ed.2d 447 (1979). *See also Block v. Rutherford,* 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984).

The Supreme Court has emphasized that "[n]ot every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." *Bell v. Wolfish, supra,* 441 U.S. at 537, 99 S.Ct. at 1873. It is therefore necessary for a court to determine "whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538, 99 S.Ct. at 1873, *citing Flemming v. Nestor,* 363 U.S. 603, 613–17, 80 S.Ct. 1367, 1374–76, 4 L.Ed.2d 1435 (1960). Accordingly, the Supreme Court has held that

> if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Bell v. Wolfish, supra,* 441 U.S. at 539, 99 S.Ct. at 1874.

■ It is undisputed that the maintenance of prison order and security is a legitimate governmental objective. Indeed, courts have often observed that "security and discipline should be paramount concerns of a prison administration" and that "inmates must be protected from violence at the hands of other inmates." *Simmat v. Manson,* 554 F.Supp. 1363, 1375 (D.Conn.1983) (Blumenfeld, J.), *citing Engblom v. Carey,* 677 F.2d 957, 970 (2d Cir. 1982) (Kaufman, J., dissenting); *Ramos v. Lamm,* 639 F.2d 559, 572 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). Restraints that are reasonably related to the maintenance of prison security, therefore, "do not, without more, constitute unconstitutional punishment." *Bell v. Wolfish, supra,* 441 U.S. at 540, 99 S.Ct. at 1874–75.

■ Furthermore, the Supreme Court has cautioned that considerations of

> whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion ... "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."

*Id.* at 540–41 n. 23, 99 S.Ct. at 1874–75 n. 23, *quoting Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974). A particular restriction or condition imposed by prison officials "does not have to be the only alternative or even the best alternative for it to be reasonable, to say nothing of constitutional." *Bell v. Wolfish, supra,* 441 U.S. at 542–43 n. 25, 99 S.Ct. at 1875–76 n. 25. Nor are prison officials "obligated to adopt the least restrictive means to meet their legitimate objectives." *Block v. Rutherford, supra,* 104 S.Ct. at 3238 n. 11.

Accordingly, the plaintiff was deprived of his Fourteenth Amendment right to substantive due process only if his transfer

from NHCCC to CCI–Somers or his placement in the administrative segregation unit at CCI–Somers was for "the purpose of punishment" rather than for "some other legitimate governmental purpose." *Bell v. Wolfish, supra,* 441 U.S. at 538, 99 S.Ct. at 1873. The court must therefore examine the evidence offered by the defendants in support of their actions as well as the evidence offered by the plaintiff in rebuttal.

The defendant Raymond M. Lopes, the current Commissioner of the Connecticut Department of Correction, states in his sworn affidavit that the plaintiff was transferred to CCI–Somers because he "posed an unreasonable security risk at the NHCCC." Lopes Affidavit at ¶ 3(H). This decision was based upon the plaintiff's "extensive criminal history, the circumstances surrounding his recent escape [from NHCCC] and his commission of several serious crimes during the short time period while he was in escape status." *Id.* As noted above, the plaintiff, a repeat offender, was convicted of having escaped from custody on April 21, 1981, and of other serious crimes committed after that escape.

The sworn affidavit of George Bronson, the current Warden of CCI–Somers, states that the plaintiff was confined to the administrative segregation unit at CCI–Somers prior to his robbery trial because prison officials feared that the presence of both the plaintiff and the Clinkscales brothers in the general population "would create an unreasonable threat to the safety and welfare of the prison community." Affidavit of George Bronson (filed June 28, 1984) ("Bronson Affidavit") at ¶ 20. *See also* Affidavit of Steven A. Tozier (filed June 23, 1984) ("Tozier Affidavit") at ¶ 21(M). Warden Bronson states in his affidavit that the Clinkscales brothers "had extensive and violent criminal histories" and that "[t]hey or their friends in the prison population were fully capable of carrying out an

act of retaliation against [the plaintiff]." Bronson Affidavit, *supra,* at ¶¶ 35–36.[2]

The plaintiff has not denied that he told prison officials in 1975 that the presence of two of the Clinkscales brothers at CCI–Somers threatened his physical safety. *See* Lopes Affidavit, Exhibit A. Indeed, the plaintiff concedes that he "had a problem" with the Clinkscales brothers at that time. *See* Plaintiff's Statement I at 14.

■ The affidavits of Commissioner Lopes, Warden Bronson and Lieutenant Tozier, as well as the plaintiff's criminal record and his previous relations with the Clinkscales brothers, constitute compelling evidence that the plaintiff's transfer from NHCCC to CCI–Somers and his pre-trial administrative segregation were reasonably related to the legitimate governmental objective of maintaining order and security at the two institutions.

The plaintiff has offered nothing more than bald assertions that his pre-trial transfer and administrative segregation were designed to punish him rather than to maintain institutional security. Such assertions are insufficient to defeat a motion for summary judgment. *See Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980) (Kaufman, J.) ("The litigant opposing summary judgment ... 'may not rest upon mere conclusory allegations or denials' as a vehicle for obtaining a trial.... [but] must bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful.").

At most, the plaintiff has suggested that the defendants exaggerated the security threat that he posed to NHCCC and CCI–Somers and that the defendants should have used alternative means to respond to this perceived threat. These assertions are insufficient to defeat the defendants' motion for summary judgment.

■ First, the court is required to defer in matters of prison security to the "profes-

---

**2.** The continued confinement of the plaintiff in administrative segregation following his conviction, and the reasons given by the defendants

for his continued confinement, are considered at part II(C), *infra.*

sional expertise of corrections officials ... in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations." *Bell v. Wolfish, supra,* 441 U.S. at 540–541 n. 23, 99 S.Ct. at 1874–75 n. 23. Similar deference must be accorded "the professional expertise of corrections officials" on a motion for summary judgment where, as here, the plaintiff has offered no evidence that the defendants overestimated the threat that he posed to institutional order and security.[3]

■ Second, the court must uphold any reasonable measure chosen by the defendants to maintain prison security even if less restrictive alternatives may also have been available. *See id.* at 542–43 n. 25, 99 S.Ct. at 1875–76 n. 25; *Block v. Rutherford, supra,* 104 S.Ct. at 3238 n. 11. It is clear that the transfer and administrative segregation of the plaintiff were reasonable means of promoting institutional security in light of the plaintiff's criminal record and his previous relations with the Clinkscales brothers. The defendants were not required to incur the costs necessary to make NHCCC a more secure institution, or to place all three Clinkscales brothers and their inmate friends in administrative segregation, merely so that the plaintiff could be confined under conditions less restrictive than those of F–Block.

Accordingly, the court holds that the plaintiff's transfer from NHCCC to CCI–Somers and his pre-trial administrative segregation were restrictions reasonably related to the maintenance of institutional security rather than punishments that could not constitutionally have been imposed prior to conviction. The plaintiff's substantive due process challenge to the conditions of his pre-trial confinement therefore must be denied.

3. Even if the plaintiff had offered some "affirmative indication" that the defendants had acted for punitive as well as non-punitive reasons, the court still would be obligated to uphold the challenged actions if they would have been taken for the non-punitive reasons alone. *See Sher*

### B.

The plaintiff also alleges that the defendants violated his constitutional right to procedural due process by failing to accord him proper hearings prior to his transfer to CCI–Somers and his pre-trial administrative segregation. A liberty interest that is protected against deprivation without procedural due process "may arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983). The court, having already found that the defendants did not deprive the plaintiffs of any liberty interest secured by the Fourteenth Amendment, therefore must determine whether the plaintiff enjoyed any right under Connecticut law to be confined to NHCCC or to the general population at CCI–Somers during his pre-trial detention.

■ The plaintiff has not directed the court's attention to any Connecticut statutes, regulations or administrative directives, or to any decisions of the Connecticut courts, that might entitle an accused to remain at a particular institution during his pre-trial detention provided that certain conditions are satisfied. Accordingly, the court must reject the plaintiff's procedural due process challenge to his transfer from NHCCC to CCI–Somers.

It is at least arguable that the plaintiff did possess a liberty interest under Connecticut law with respect to his placement in the general prison population at CCI–Somers. *See, e.g., McAlister v. Robinson,* 488 F.Supp. 545, 554–55 (D.Conn.1978) (Clarie, C.J.) (adopting opinion of Eagan, Magistrate), *aff'd sub nom. Raffone v. Robinson,* 607 F.2d 1058 (2d Cir.1979) (Lumbard, J.) (inmates transferred from general population to administrative segregation at CCI–Somers had a liberty interest protected by the Due Process Clause). *But see, e.g., Hewitt v. Helms, supra,* 459 U.S.

*v. Coughlin,* 739 F.2d 77, 81–82 (2d Cir.1984) (Newman, J.), *citing Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) and *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

471, 103 S.Ct. 871 (holding that "the mere fact that [a state] has created a careful procedural structure to regulate the use of administrative detention" does not indicate the existence of a protected liberty interest). However, even if one assumes for the argument that the plaintiff possessed a protected liberty interest in being assigned to the general prison population, a constitutional violation occurred only if the plaintiff was deprived of that liberty interest without due process of law.

The Supreme Court has adopted a three-part analysis to determine what process is due under the Fourteenth Amendment in connection with the deprivation of a protected liberty or property interest. *See Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). The factors to be considered are the private interests at stake in a governmental decision, the governmental interests involved and the value of particular procedural requirements.

This three-part analysis was applied in *Hewitt v. Helms, supra,* to determine what process was due a convicted prisoner who had been placed in administrative segregation and thereby deprived of a liberty interest protected under state law. The Supreme Court found that the Due Process Clause merely required that the inmate "receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." 459 U.S. at 476, 103 S.Ct. at 874.

In the instant case, as in *Hewitt v. Helms,* the plaintiff's "private interest is not one of great consequence," because "[h]e was merely transferred from one extremely restricted environment to an even more confined situation" and because his segregation would not carry "the stigma of wrongdoing or misconduct" or "have any significant effect on parole opportunities." *Id.* at 473, 103 S.Ct. at 872. Likewise, the governmental interests in both cases "are of great importance," because "[t]he safety of the institution's guards and inmates is

perhaps the most fundamental responsibility of the prison administration." *Id.*

Finally, in considering the value of particular procedures in determining whether an inmate poses a threat to prison security, the Supreme Court observed that

> [t]he judgment of prison officials in this context ... turns largely on "purely subjective evaluations and on predictions of future behavior" ...; indeed, the administrators must predict not just one inmate's future actions but those of an entire institution. Owing to the central role of these types of intuitive judgments, a decision that an inmate or group of inmates represents a threat to the institution's security would not be appreciably fostered by the trial-type procedural safeguards suggested by respondent. This, and the balance of public and private interests, lead us to conclude that the Due Process Clause requires only an informal, nonadversary review of evidence ... in order to confine an inmate feared to be a threat to institutional security to administrative segregation.

*Id.* at 474, 103 S.Ct. at 873. It is clear that the same sorts of "subjective evaluations" and "predictions of future behavior" must be made by prison officials regardless of whether the inmate feared to be a security threat is a pretrial detainee or a convicted prisoner.

■ In sum, there appears to be no reason why the procedural safeguards accorded an inmate in connection with his transfer to administrative segregation ought to differ depending upon whether he is a pretrial detainee or a convicted prisoner. Accordingly, the court holds that all prison inmates, regardless of whether they have yet been convicted of a crime, are entitled to the same procedural protections in connection with their confinement in administrative segregation. In other words, the pretrial detainee, like the convicted prisoner, is entitled under the Due Process Clause to "receive some notice of the charges against him and an opportunity to present his views to the prison official

charged with deciding whether to transfer him to administrative segregation." *Id.* at 476, 103 S.Ct. at 874. However, neither the pretrial detainee nor the convicted prisoner has a constitutional right to a trial-type evidentiary hearing incident to his administrative segregation.

█ It is undisputed that the plaintiff in this case received a hearing before the Classification Committee on September 8, 1981, concerning his request to be released to the general prison population. The plaintiff was given advance written notice of the time and place of the hearing, the reasons for his placement in administrative segregation, and his rights to obtain a "staff advocate" to act in his behalf and to call "[a] reasonable number of relevant and non-redundant witnesses." *See* Tozier Affidavit, Exhibit F. The plaintiff declined to comment at the hearing concerning his relations with the Clinkscales brothers and other matters relevant to his release from segregation. *See id.*, Exhibit G. There is no evidence that the plaintiff exercised his right to appeal the Classification Committee's recommendation that he remain in the administrative segregation unit. The defendants cannot be faulted under these circumstances for relying on earlier undisputed evidence of the plaintiff's fear for his physical safety at the hands of the Clinkscales brothers.

It is clear in light of the foregoing undisputed evidence that the plaintiff received at least as much process as he was due under the Fourteenth Amendment with respect to his administrative segregation. Accordingly, the plaintiff's procedural due process challenge to the conditions of his pre-trial confinement must be rejected.

### C.

█ Similar reasons require the rejection of the plaintiff's procedural due process challenge to his post-trial administrative segregation.

The affidavit of Warden Bronson indicates that additional factors caused prison officials to retain the plaintiff in the administrative segregation unit following his conviction on October 28, 1982, and the departure from CCI–Somers of two of the three Clinkscales brothers on or before December 7, 1982. The first of these factors was the arrival at CCI–Somers of Theodore Casiano, who had testified against the plaintiff at his recent robbery trial and who is described in the affidavit as "a dangerous individual." Bronson Affidavit at ¶ 48. Warden Bronson states that "[t]here was obvious bad blood between [the plaintiff] and Casiano," *id.* at ¶ 50, and the plaintiff conceded as much in his own statements to prison officials. *See id.*, Exhibits C, D, E. The second factor that contributed to the plaintiff's continued administrative segregation was his "poor institutional behavior," including incidents of threatening and assaultive conduct, which caused the defendants to conclude that the plaintiff posed "a threat to the good order and safety of the prison." Lopes Affidavit at ¶ 4(O).

It is therefore evident that the administrative segregation of the plaintiff following his conviction continued to be motivated primarily, if not exclusively, by non-punitive concerns reasonably related to the legitimate governmental objective of maintaining order and security at CCI–Somers. The plaintiff has offered no evidence that the defendants' decision to extend his administrative segregation because of his "poor institutional behavior" was designed to punish him for past misconduct rather than to ensure that he could function appropriately if released into the general population. Indeed, the record indicates that the plaintiff was separately punished for his misconduct during the period of his administrative segregation. *See* Plaintiff's Statement II at ¶¶ 38, 40, 45, 48, 49, 50, 53, 54, 69, 76, 81, 84, 89, 90, 94.

The plaintiff correctly observes that the Supreme Court stated in *Hewitt v. Helms* that "administrative segregation may not be used as a pretext for indefinite confinement of an inmate." 459 U.S. at 477 n. 9, 103 S.Ct. at 874 n. 9. However, the Court went on to emphasize in that decision that, while "[p]rison officials must engage in

some sort of periodic review of the confinement of such inmates,"

> [t]his review will not necessarily require that prison officials permit the submission of additional evidence or statements. The decision whether a prisoner remains a security risk will be based on facts relating to a particular prisoner—which will have been ascertained when determining to confine the inmate to administrative segregation—and on the officials' general knowledge of prison conditions and tensions, which are singularly unsuited for "proof" in any highly structured manner.

*Id.*

It is undisputed that the plaintiff in this case was provided with a monthly review of his status by the Special Offenders Classification Committee and a bimonthly review of his status by the full Classification Committee. *See* Plaintiff's Statement II at ¶¶ 27, 28. He was entitled to appear at the reviews of the Special Offenders Classification Committee. *See* Tozier Affidavit, Exhibit C. The plaintiff has failed to offer any suggestion, much less any evidence, that he was not informed of the reasons for his continued administrative segregation or was prevented from presenting additional evidence concerning his status to the Special Offenders Classification Committee or to other prison officials.

The court concludes on the basis of this undisputed evidence that the plaintiff was accorded all of the procedural safeguards to which he was constitutionally entitled with respect to his continued administrative segregation from the time of his conviction on October 28, 1982, until his release to the general population on March 2, 1984. The plaintiff's procedural due process challenge to his post-conviction confinement must therefore be rejected.

### III. The Equal Protection Challenge

■ The plaintiff contends that his transfer to CCI–Somers and his pre-trial administrative segregation also violated his rights under the Equal Protection Clause of the Fourteenth Amendment. The plaintiff has not suggested that he was singled out for unequal treatment on account of his membership in any "suspect class." Accordingly, the actions of the defendants must be upheld if they are found to be "rationally related to furthering a legitimate state interest." *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976) (per curiam). *See also Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979) (state action must be upheld under rational-basis test unless "the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the [challenged] actions were irrational").

As discussed in greater detail above, the defendants' actions in transferring the plaintiff from NHCCC to CCI–Somers and placing the plaintiff in administrative segregation were "rationally related to furthering a legitimate state interest" in institutional order and security. It cannot be said that the defendants acted "irrationally" in transferring a person who had recently escaped from custody to more secure surroundings or in separating that person from inmates who had previously threatened his physical safety. Accordingly, the plaintiff's equal protection challenge to the conditions of his pre-trial confinement must be rejected.

### IV. The Eighth Amendment Challenge

Finally, the plaintiff contends that the conditions of his post-conviction confinement in the administrative segregation unit violate his right under the Eighth Amendment to be free from cruel and unusual punishment.

■ The Supreme Court has held that "the Eighth Amendment prohibits punishments which, although not physically barbarous, 'involve the unnecessary and wanton infliction of pain,' ... or are grossly disproportionate to the severity of the crime." *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981), *quoting Gregg v. Georgia,* 428

U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976). However, conditions that are "restrictive and even harsh," but that are not "cruel and unusual under contemporary standards," are constitutionally permissible as "part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 347, 101 S.Ct. at 2399. Moreover, the Supreme Court has emphasized that "Eighth Amendment judgments should neither be nor appear to be merely the subjective views" of judges. *Id., citing Rummel v. Estelle,* 445 U.S. 263, 275, 100 S.Ct. 1133, 1140, 63 L.Ed.2d 382 (1980).

■ The obligations imposed upon state prison officials by the Eighth Amendment were further delineated by our Court of Appeals in *Wolfish v. Levi,* 573 F.2d 118, 125 (2d Cir.1978) (Kaufman, J.), *rev'd on other grounds sub nom. Bell v. Wolfish, supra,* 441 U.S. 520, 99 S.Ct. 1861:

> An institution's obligation under the eighth amendment is at an end if it furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety. The Constitution does not require that sentenced prisoners be provided with every amenity which one might find desirable.

*See also Lareau v. Manson,* 651 F.2d 96, 106 (2d Cir.1981) (Mansfield, J.) (same). The plaintiff in this case has not challenged the adequacy of the food, clothing, medical care or personal safety provided by the defendants. Consequently, his only claims that are potentially cognizable under the Eighth Amendment concern the size of his cell, the amount of time that he was required to spend within the cell, and the frequency with which he was permitted to shower.

Similar complaints were rejected by the Connecticut Supreme Court in *Arey v. Warden,* 187 Conn. 324, 445 A.2d 916 (1982). That court relied upon *Rhodes v. Chapman, supra,* in holding that "the totality of conditions" in the administrative segregation unit of CCI–Somers did not offend the Eighth Amendment's prohibition of cruel and unusual punishment. The plaintiff has offered no additional evidence of conditions in F–Block that might call for a contrary conclusion in this case and has cited no decisions in which similar conditions were found by other courts to constitute "cruel and unusual punishment." For example, the plaintiff in this case was allowed nearly twice as many square feet of space in his cell as were the plaintiffs in *Lareau v. Manson,* 507 F.Supp. 1177 (D.Conn.1980), *aff'd in part, modified in part,* 651 F.2d 96 (2d Cir.1981).

Moreover, conditions in the administrative segregation unit appear to have improved, if anything, since the events at issue in *Arey v. Warden.* For example, the plaintiff in this action was entitled to three showers per week during his administrative segregation rather than the two showers per week allowed the petitioner in the state action during his earlier confinement in F–Block.

Accordingly, the court holds that the plaintiff's claim under the Eighth Amendment must also be rejected.

### Conclusion

For the reasons stated above, the defendants' motion for summary judgment is hereby granted. Judgment for the defendants shall enter forthwith.

It is so ordered.