John MANLEY, Jr.

v.

George BRONSON, Warden, et al.

Civ. No. H–85–279 (PCD).

United States District Court,
D. Connecticut.

March 20, 1987.
Recommended Ruling: Feb. 9, 1987.

Madonna Sacco, James Greene, Legal Aid to Prisoners, West Hartford, Conn., for plaintiff.

Peter E. Wiese, Asst. Atty. Gen., Joseph I. Leiberman, Atty. Gen., Hartford, Conn., for defendants.

DORSEY, District Judge.

Though an extension was granted to petitioner, no objection to the Recommended Ruling has been filed. Having cogently discussed plaintiff's claims according to the proper legal standards, the Magistrate's Recommended Ruling, after review and absent objection, is hereby adopted and approved.

So Ordered.

### RECOMMENDED RULING ON PENDING MOTION FOR SUMMARY JUDGMENT

JOAN GLAZER MARGOLIS, United States Magistrate.

On April 1, 1985, plaintiff John Manley ("plaintiff"), an inmate incarcerated at the Connecticut Correctional Institution at Somers ("CCIS"), commenced this civil action against defendants George Bronson, Warden of CCIS, Frank Crose, Deputy Warden of CCIS, and P. Harvey, Captain of CCIS, seeking redress for plaintiff's placement in "deadlock" and his subsequent removal from the general prison population to administrative segregation.

On April 3, 1986, court-appointed counsel filed an amended complaint. Plaintiff's amended complaint alleges that he was placed in "deadlock" and subsequently placed in a segregation unit without due process guaranteed by the Fourteenth Amendment of the Constitution, and further that the conditions and duration of plaintiff's segregation resulted in cruel and unusual punishment in violation of his Eighth Amendment rights.

On August 21, 1986, defendants filed a motion for summary judgment, a statement of material facts not in dispute ("Defendants' Statement"), and a memorandum in support of their motion to which was attached the affidavit of Richard Orszak, Assistant Warden in charge of treatment at CCIS ("Orszak Affidavit"). On October 6, 1986, plaintiff filed a statement of material facts not in dispute ("Plaintiff's Statement") and a memorandum of law in opposition to defendants' motion.

After careful consideration of defendants' motion and for the reasons discussed herein, defendants' motion for summary judgment is granted.

### I. FACTUAL BACKGROUND

The undisputed facts apparently are as follows: On February 20, 1985, plaintiff was living in a general population unit at CCIS. (Plaintiff's Statement ¶ 5; Defendants' Statement ¶ 4). On that date another inmate was stabbed during an altercation in plaintiff's housing unit. (Plaintiff's Statement ¶ 5; Defendants' Statement ¶ 5; Orszak Affidavit ¶ 6). Subsequent to the altercation, prison officials received information that plaintiff was involved in the

stabbing incident and that plaintiff's personal safety was in jeopardy. (Plaintiff's Statement ¶ 6; Defendants' Statement ¶ 5; Orszak Affidavit ¶ 7). Plaintiff was questioned that day about the stabbing incident, denying any involvement therewith. (Plaintiff's Statement ¶ 7). Subsequent to the questioning, plaintiff was confined to his cell, where he remained for twenty-four hours. (Plaintiff's Statement ¶¶ 7–8; Defendants' Statement ¶ 6; Orszak Affidavit ¶ 8).[1] Prison officials verbally informed plaintiff that the reason for his confinement was their concern for his personal safety and the security of CCIS. (Defendants' Statement ¶ 6; Orszak Affidavit ¶ 8). As a result of his confinement, plaintiff was not allowed to participate in recreational activities or dine with other inmates. (Plaintiffs' Statement ¶ 8).

The following day, February 21, 1985, plaintiff was given written notice of an institutional Classification Committee hearing to be held on February 25, 1985. (Plaintiff's Statement ¶ 9; Defendants' Statement ¶ 7; Orszak Affidavit ¶ 9 & Exh. C). The notice provided that the purpose of the hearing was to determine if plaintiff's presence in general population posed a threat to either his personal safety or to the safety and security of the CCIS community. (Defendants' Statement ¶ 7; Orszak Affidavit ¶ 9 & Exh. C). Subsequent to notification of the hearing, plaintiff was transferred to administrative segregation, pending the outcome of the Classification Committee hearing. (Plaintiff's Statement ¶ 9; Defendants' Statement ¶ 8; Orszak Affidavit ¶ 10 & Exh. D).

On February 25, 1985, the Classification Committee hearing was held, at which plaintiff appeared and was represented by a staff advocate. (Plaintiff's Statement ¶ 10; Defendants' Statement ¶ 9; Orszak Affidavit ¶ 11). At the hearing, plaintiff denied any involvement with the stabbing incident. (Plaintiff's Statement ¶ 10). Plaintiff did not, however, request that witnesses testify on his behalf. (Defendants' Statement ¶ 9; Orszak Affidavit ¶ 11).[2]

The Committee thereafter recommended to the Warden that plaintiff remain in administrative segregation, basing its written decision upon concern for plaintiff's personal safety and the safety and security of CCIS. (Defendant's Statement ¶ 10; Orszak Affidavit ¶ 11 & Exh. E). Plaintiff received notification thereof and was informed of the process and procedures to obtain classification review. (Defendants' Statement ¶ 12; Orszak Affidavit ¶ 11). Shortly thereafter, Warden Bronson and Commissioner Lopes approved the Committee's recommendation. (Defendants' Statement ¶ 13; Orszak Affidavit ¶ 12).

During his confinement in administrative segregation, plaintiff's status was periodically reviewed in his presence by the special offender Classification Committee. (Defendants' Statement ¶ 14; Orszak Affidavit ¶ 13).

As a result of his placement in segregation, plaintiff was confined to his cell for twenty-three hours a day, receiving only one hour of recreation; his contact with fellow inmates was severely restricted.[3] (Plaintiff's Statement ¶ 12). Plaintiff's single person cell was approximately 6 feet 2 inches wide by 9 feet long, equipped with a bunk, desk, toilet and sink, with shower facilities available outside. (Defendants' Statement ¶ 15; Orszak Affidavit ¶ 15). Plaintiff was provided with three meals a day. (Defendants' Statement ¶ 16; Orszak Affidavit ¶ 15). Access to such services as medical, legal and other visits, were avail-

---

1. Prison officials have the authority to order such confinement pursuant to Department of Correction Administrative Directives Chap. 2.6 (Orszak Affidavit ¶ 8 & Exh. B). This directive permits prison officials to remove an inmate from general population pending the outcome of a classification hearing. *See* note 5 *infra*.

2. Plaintiff alleges that he was not confronted with the information which the Classification Committee had available at the time of the hear-

ing (Plaintiff's Statement ¶ 11), but does not enlighten the Court with what information was being withheld from him that may have prejudiced his position and the outcome of the Classification Committee hearing.

3. In his amended complaint (¶ C.12.d.), plaintiff further alleges that he was denied access to religious services, although this is not mentioned in Plaintiff's Statement.

able outside the cell area. (*Id.*). Other services, such as religious and law library counseling, were provided within the confines of administrative segregation. (*Id.*) As a result of his segregation, plaintiff lost his job as a barber, no longer received pay for his work, and no longer received an extra day of good time as previously earned. (Plaintiff's Statement ¶ 13; Defendants' Statement ¶ 17; Orszak Affidavit ¶ 16). While incarcerated in administrative segregation, however, plaintiff was awarded statutory good time and also received inmate pay. (Defendants' Statement ¶ 18).

On August 9, 1986, plaintiff was returned to the general population at CCIS. (Defendants' Statement ¶ 14; Orszak Affidavit ¶ 14). At no time prior to or during his confinement in segregation was plaintiff given a disciplinary ticket for violating an institutional rule nor was he criminally charged because of the incident. (Plaintiff's Statement ¶ 14).

## II. DISCUSSION

F.R.Civ.P. 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(e) continues:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

In *Celotex Corp. v. Catrett*, — U.S. —, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986), now Chief Justice Rehnquist characterized the summary judgment procedure "not as a disfavored procedural shortcut but rather as an integral part of the Federal Rules as a whole ..." Justice Rehnquist continued:

Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Id.* at 2555. As Justice Rehnquist observed, a party opposing summary judgment may rely upon any of the evidentiary materials listed in Rule 56(c), except the mere pleadings themselves. *Id.* at 2554. In considering a motion for summary judgment, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, — U.S. —, 106 S.Ct. 2505, 2509-11, 91 L.Ed.2d 202 (1986); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986).[4]

### A. DUE PROCESS

Plaintiff's Fourteenth Amendment due process claims are two-fold: first, that plaintiff's placement in "deadlock" and subsequent transfer to administrative segregation without prior notice or hearing violated his rights to procedural due process (Amended Complaint ¶ D.1); and second, that the decision of the Classification Committee was not based upon sufficient evidence (Amended Complaint ¶ D.3).

The starting point here is, of course, *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) ("*Wolff*"), where the Supreme Court established the procedural due process rights accorded inmates in disciplinary proceedings. While acknowledging that "[t]here is no iron curtain drawn between the Constitution and the prisons of this country," *id.* at 555-56, 94 S.Ct. at 2974, the Court further ruled that "the full panoply of rights due a de-

---

**4.** In *Knight,* Chief Judge Feinberg described as "inaccurate" the "perception that this court is unsympathetic to such motions and frequently reverses grants of summary judgment." 804 F.2d at 12.

fendant" in a criminal prosecution does not apply to prison disciplinary proceedings. *Id.* at 556, 94 S.Ct. at 2975. The Court further acknowledged that "[p]rison disciplinary proceedings ... take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so," *id.* at 561, 94 S.Ct. at 2977, so that there is "much more than a theoretical possibility" that such proceedings could result in further violence and/or retaliation. *Id.* at 562–63, 94 S.Ct. at 2978. With these considerations in mind, the Court held that the due process clause of the Fourteenth Amendment imposes the following requirements in prison disciplinary proceedings: (1) written notice of charges must be given the inmate at least twenty-four hours before the hearing; (2) the inmate must be given a written statement of the evidence relied upon and reasons for the disciplinary action; (3) the inmate may call witnesses and present evidence in his defense before an impartial tribunal, as long as there is no jeopardy to the security of the prison; (4) as an inmate has no constitutional right to confront and cross-examine witnesses, the opportunity therefor is left to the sound discretion of prison officials; (5) although an inmate has no right to appointed counsel, an inmate advocate should be appointed in appropriate circumstances; and (6) the prisoner must receive a written statement of the reasons relied upon by the tribunal in rendering its decision. *Id.* at 563–72, 94 S.Ct. at 2978–82.

The *Wolff* opinion was critical to a decision within this district, *McAlister v. Robinson*, 488 F.Supp. 545 (D.Conn.1978), *aff'd on other grounds sub nom. Raffone v. Robinson*, 607 F.2d 1058 (2d Cir.1979) ("*McAlister*"), regarding administrative segregation at CCIS. In construing the same administrative directive at issue here,[5] Magistrate Eagan, in a decision approved by Judge Clarie, found that prisoners had a "liberty interest" protected by the Fourteenth Amendment, as such directive "creates an expectation on the part of the prisoner that he will not be placed in administrative segregation so long as none of [the] conditions [in the directive] exist." 488 F.Supp. at 555. Magistrate Eagan thereafter held that the procedural due process requirements in *Wolff* should be extended to administrative segregation, not just punitive segregation, concurring with a similar ruling in *Wright v. Enomoto*, 462 F.Supp. 397 (N.D.Cal.1976) (three-judge panel), *aff'd mem.*, 434 U.S. 1052, 1054, 98 S.Ct. 1223, 1224, 55 L.Ed.2d 756 (1978). 488 F.Supp. at 555–57. As such, the court found that the plaintiffs' procedural due process rights had been violated by the manner in which plaintiffs had been transferred to Block F administrative segregation. *Id.* at 557–59.

In 1983, the Supreme Court decided *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) ("*Hewitt*"), in which it applied lesser due process standards for administrative segregation than for punitive segregation. The Court in *Hewitt* held that because "[i]t is plain that the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison term," an inmate's transfer from general population to administrative segregation does not give rise to a right created by the Constitution. *Id.* at 468, 103 S.Ct. at 869. However, the Court found that the prisoner's liberty interest in remaining in general population was established by virtue of the applicable Pennsylvania statutes and regulations, which had repeated use of explicitly mandatory language. *Id.* at 469–72, 103

---

**5.** Chapter 2.6(a) of the State of Connecticut Department of Corrections, *Administrative Directives,* provides as follows:

    *Administrative Segregation*

    Inmates may be placed in administrative segregation for any of the following reasons:

    (a) At the inmate's own request.

    (b) For the protection of self or others or for the welfare of the institution community.

    (c) Inmates who after punitive treatment still cannot reasonably and safely be returned to the regular inmate population.

S.Ct. at 870–71.[6] The Court thus considered the degree of process which was due under these circumstances. *Id.* at 472–76, 103 S.Ct. at 871–73. The Court observed:

> In assessing the seriousness of a threat to institutional security, prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and long-standing relations between prisoners and guards, prisoners *inter se*, and the like. In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents.

*Id.* at 474, 103 S.Ct. at 872. Thus the Court held that "an informal, nonadversary evidentiary review" was sufficient for administrative segregation, pending completion of an investigation. *Id.* at 476, 103 S.Ct. at 874. Lesser notice requirements also were imposed—"[a]n inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison officials charged with deciding whether to transfer him to administrative segregation." *Id.* Lastly,

the proceeding must occur "within a reasonable time following an inmate's transfer" under the circumstances. *Id.* at n. 8. Thus, the Court was "satisfied that [plaintiff] received all the process that was due after being confined to administrative segregation." *Id.* at 477, 103 S.Ct. at 874.[7]

The *Wolff* decision was further refined in *Ponte v. Real*, 471 U.S. 491, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985) ("*Ponte*"), which concerned a disciplinary hearing at which the prison officials denied, without explanation, an inmate's request to call three of his four desired witnesses. The Court held that the due process did not require a disciplinary board to state in writing at the time of the hearing its reason for refusing to call a witness. *Id.* at 496, 105 S.Ct. at 2195. Nor did the disciplinary board have "unreviewable discretion" in this regard either. *Id.* at 498, 105 S.Ct. at 2197. Instead the Court held that

> prison officials may be required to explain, in a limited manner, the reason why witnesses were not allowed to testify, but ... they may do so either by making the explanation a part of the "administrative record" in the disciplinary proceeding, or by presenting testimony in court if the deprivation of a "liberty" interest is challenged because of that claimed defect in the hearing. In other words, the prison officials may choose to explain their decision at the

---

*See* note 1 *supra.*

**6.** A question has been raised whether *McAlister's* holding on a prisoner's "liberty interest" survives *Hewitt.* In *Torres v. Robinson,* Civ. No. H82–645(MJB) (D.Conn. Apr. 30, 1985, Magistrate's Ruling adopted May 22, 1985), *reprinted in* 11 *Conn.L.T.* No. 50, at 7 (Dec. 16, 1985), Magistrate Eagan found that although the administrative directive at issue here, *see* note 5 *supra,* does not use mandatory language as did the Pennsylvania statutes and regulations in *Hewitt,* such directive sets forth the *only* reasons for which an inmate may be placed in administrative segregation. 11 *Conn.L.T.* No. 50, at 9. Accordingly, the Court concluded that "under this directive, inmates have an expectation of not being transferred to administrative segregation unless one of the reasons listed is found to exist" and thus *McAlister's* holding on this issue was not altered by *Hewitt.*

In *Dolphin v. Manson,* 626 F.Supp. 229 (D.Conn. 1986), Judge Cabranes acknowledged that there may be some conflict between this portion of *McAlister* and *Hewitt.* At 236–37. However, for purposes of plaintiff's procedural due process claims, Judge Cabranes assumed *arguendo* that plaintiff possessed a protected liberty interest. *Id.* at 237.

**7.** The Court noted, however, that "Of course, administrative segregation may not be used as a pretext for indefinite confinement of an inmate." *Id.* 459 U.S. at 477 n. 9, 103 S.Ct. at 874 n. 9. Instead, periodic review was necessary, although the Court did not "necessarily require that prison officials permit the submission of any additional evidence or statements" at such review proceedings. *Id.*

Plaintiff here did receive periodic reviews of his confinement in administrative segregation.

hearing, or they may choose to explain it "later."

*Id.* at 497, 105 S.Ct. at 2196.

Just two weeks ago, the Second Circuit considered the appropriate standards to be applied for confinements pending disposition of misconduct charges in *Bolden v. Alston,* 810 F.2d 353 (2d Cir.1987) (*"Bolden"*). Plaintiff, a New York prisoner, had received 12–hours notice (the opinion does not state if such notice was written or oral) of a hearing before the "Adjustment Committee" and was not notified of his right to call witnesses. At 355. This committee recommended that plaintiff be held in a special housing unit, with more restricted confinement than in general population, pending a "Superintendent's Proceeding." *Id.* This second proceeding was held five days later, which hearing satisfied the due process requirements set forth in *Wolff. Id.* at 356. The Second Circuit held that the lesser standards articulated in *Hewitt* applied to plaintiff's first hearing rather than the more stringent standards established in *Wolff. Id.* at 357–58. *See also Miller v. Lopes,* Civ. No. H84–1133(TEC) (D.Conn. Dec. 3, 1986, Magistrate's Ruling approved Dec. 23, 1986), slip op. at 9–15 (*"Miller"*) (prisoner has no due process right to have prison officials introduce documentary evidence (in this case contraband) which formed the basis for his disciplinary hearing); *Dolphin v. Manson,* 626 F.Supp. 229, 238 (D.Conn.1986), (*"Dolphin"*) (pretrial detainee who had been placed in CCIS' Block F administrative segregation for his own protection, was accorded due process requirements set forth in *Hewitt,* in that plaintiff had been given prior written notice of the time and place of the hearing before the Classification Committee, the reasons for his placement in administrative segregation, and his right to obtain a staff advocate to act on his behalf and to call a reasonable number of witnesses); *Torres v. Robinson,* Civ. No. H82–645(MJB) (D.Conn. Apr. 30, 1985, Magistrate's Ruling approved May 22, 1985), *reprinted in* 11 *Conn.L.T.* No. 50, at 7, 10

(Dec. 16, 1985) (*"Torres"*) (an inmate at CCIS placed in administrative segregation following a prison riot was entitled to have exculpatory information received after his classification committee hearing considered at the first periodic review after the information became known).

It is against this background that plaintiff's claims must be considered. Plaintiff's placement in "deadlock" on February 20, 1985 and his transfer the next day to administrative segregation did not violate the due process clause of the Fourteenth Amendment.[8] The defendant prison officials acted within the scope of their authority when they restricted plaintiff to administrative segregation after he was implicated in a stabbing incident. They were motivated to remove plaintiff from the general prison population as they had reliable information that his safety was in danger and were further concerned that the security of the prison would be at risk.

■ As to plaintiff's first claim that he was placed in deadlock without written notice on February 20, 1985, *Hewitt* requires only "some notice" prior to an administrative segregation hearing, 459 U.S. at 476, 103 S.Ct. at 874, not twenty-four hours written notice as required by *Wolff* for disciplinary hearings. 418 U.S. at 563–64, 94 S.Ct. at 2978. *See also Bolden,* at 357. The next day, February 21, 1985, he received written notice of the Classification Committee hearing, scheduled for four days thereafter, on February 25, 1985. Under these circumstances, which were analogous to these found in *Bolden,* it cannot be said that plaintiff's procedural due process rights were violated by defendants on February 20, 1985 by affording plaintiff verbal notice only.

■ On February 21, 1985, plaintiff was given written notice of a Classification Committee hearing to be held February 25, 1985, to determine whether he should be removed to administrative segregation for his personal safety and the safety and se-

---

8. For purposes of this recommended ruling, the Court assumes, as did Judge Cabranes in *Dolphin,* that plaintiff possesses a "liberty interest" protected by the due process clause of the Fourteenth Amendment. *See* note 6 *supra.*

curity of CCIS. He was present at the hearing with a staff advocate. Shortly after the hearing, plaintiff received notification of the Committee's decision to classify plaintiff for administrative segregation; he was informed of the process and procedures for review of his classification. While in administrative segregation, plaintiff's status was reviewed on a regular basis. Under the facts of this case, it is clear that the procedures followed by defendant prison officials met the standards for procedural due process established in *Hewitt, Bolden,* and *Dolphin.* Accordingly, plaintiff received all the process that was due.

■ As to plaintiff's second claim that the Classification Committee's decision was not based upon sufficient evidence, the court's function is to determine whether there is "some evidence" which supports the board's decision. *Superintendent, Massachusetts Correctional Institution v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 2773, 86 L.Ed.2d 356 (1985) ("*Hill*"); *Freeman v. Rideout,* 808 F.2d 949, 954 (2d Cir.1986); *Miller, supra,* slip op. at 10–11. As the Court stated in *Hill* with respect to disciplinary hearings:

> Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is *whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.* We decline to adopt a more stringent evidentiary standard as a constitutional requirement.

105 S.Ct. at 2774 (emphasis added). The two pages of minutes and decision from the

Classification Committee hearing reveals "some evidence" to support the conclusion reached by said committee. As such, plaintiff's second due process claim also fails.[9]

## B. EIGHTH AMENDMENT

Plaintiff further alleges that his rights under the Eighth Amendment were violated because the conditions within "deadlock" and administrative segregation constituted cruel and unusual punishment. (Amended Complaint ¶¶ D.2 & 4). More specifically, plaintiff alleged that he was confined to his cell for twenty-three hours a day, that he received only one hour of recreation per day, that his association with fellow inmates was severely restricted, that he was denied participation in religious services,[10] and that he was removed from his institutional job as a barber.

■ The Constitution prohibits punishment that is "cruel and unusual." *Rhodes v. Chapman,* 452 U.S. 337, 345, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59 (1981) ("*Rhodes*"). Eighth Amendment protection reaches punishments which "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976). However, the Eighth Amendment is not violated because prisoners are not provided with every amenity. *Newman v. Alabama,* 559 F.2d 283, 291 (5th Cir.1977). The Eighth Amendment requires only that the institution provide meals, shelter, clothing, sanitation, medical care and personal safety. *Wolfish v. Levi,* 573 F.2d 118, 125 (2d Cir.1978), *rev'd on other grounds sub nom. Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

■ The conditions in Block F administrative segregation at CCIS have been chal-

---

**9.** While plaintiff fails to allege in his amended complaint that defendants failed to confront him with all the information which was available at the time of the hearing, he does make such a claim in his Statement. *See* note 2 *supra.* Accordingly, the Court need not resolve this issue, except to note that even this claim appears to be without merit in light of *Ponte* and *Miller.*

**10.** Defendants maintain, however, that plaintiff was provided the opportunity for religious services within the limitations of administrative segregation. (Defendants' Statement ¶ 16; Orszak Affidavit ¶ 15). *See* note 3 *supra.*

lenged twice recently; in both decisions, plaintiffs' Eighth Amendment claims were rejected. In *Arey v. Warden*, 187 Conn. 324, 445 A.2d 916 (1982), the Connecticut Supreme Court reviewed the standards set forth in *Rhodes* and held that "the totality of the circumstances" there did not constitute cruel and unusual punishment. 187 Conn. at 329–330, 445 A.2d 916. This same claim was raised more recently, in *Dolphin, supra*, in which Judge Cabranes observed that conditions in Block F had improved since the *Arey* decision. At 240. He therefore held that plaintiff's Eighth Amendment claim was without merit. *Id.* at 240. For the same reasons as stated by Judge Cabranes in *Dolphin*, plaintiff's Eighth Amendment claims here must be rejected.

■ Plaintiff's additional claim that he was denied his job as an institutional barber is equally without merit. Plaintiff lost his job as a direct result of his transfer to administrative segregation. His lost job opportunity was a result incident to his transfer and not an act of unfettered discretion by prison officials. Under similar circumstances, when prison jobs were sharply curtailed in the aftermath of a prisoner "work strike," the Seventh Circuit ruled that federal prisoners have no property or liberty interest in prison employment. *Garza v. Miller*, 688 F.2d 480, 485–86 (7th Cir.1982), *cert. denied*, 459 U.S. 1150, 103 S.Ct. 796, 74 L.Ed.2d 1000 (1983). *See also Barlow v. Lopez [Lopes]*, Civ. No. H85–529 (PCD) (D.Conn. June 24, 1985) [Available on WESTLAW, DCT database] (a prisoner has no constitutional right to a particular job in a correctional institution); *Banks v. Norton*, 346 F.Supp. 917, 921 (D.Conn.1972) (same).

### III.  CONCLUSION

For the reasons stated above, the Court hereby grants the defendants' motion for summary judgment as to plaintiff's Fourteenth Amendment and Eighth Amendment claims.

*See* 28 U.S.C. Section 636(b); F.R.Civ.P. 72; Rule 2 of the Local Rules for United States Magistrates, United States District Court for the District of Connecticut.